IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| NICHOLAS J. ROBERTS, an individual,<br><br>Plaintiff,<br><br>v.<br><br>JAMES M. WINDER, individually; ROSIE RIVERA, in her official capacities as the Salt Lake County Sheriff and CEO of the Unified Police Department of Greater Salt Lake; and THE UNIFIED POLICE DEPARTMENT OF GREATER SALT LAKE,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER<br><br>Case No. 2:17-cv-00298-DAK<br><br>Judge Dale A. Kimball |

This matter is before the court on Defendants' Motion for Summary Judgment. On July 2, 2020, the court telephonically held oral argument on the motion. Defendants were represented by R. Scott Young and Camille N. Johnson, and Plaintiff was represented by Jesse C. Trentadue and Robert W. Hughes. The court took the matter under advisement. The court considered carefully the memoranda and other materials submitted by the parties, as well as the law and facts relating to the motion. Now being fully advised, the court issues the following Memorandum Decision and Order.

## BACKGROUND

In August 1996, former Salt Lake County Sheriff Aaron Kennard ("Kennard") appointed Defendant Nicholas J. Roberts ("Roberts") to the position of Range Master-Firearms Instructor ("Range Master"). After serving as the Range Master for nine years, in 2005, Roberts tested for and obtained a merit rank advancement from Deputy to Sergeant. In 2006, Defendant James M.

Winder ("Winder") won the election to become the Salt Lake County Sheriff over incumbent Kennard. During that election, Winder sought the support of many of the officers in the police force, including Roberts. Roberts, however, expressed that he had already promised his support to Kennard. Nevertheless, Roberts explained that, if Winder won the election, he would support him. After winning the 2006 election, Winder took office as Salt Lake County Sheriff in 2007. Once assuming office, Winder transferred officers periodically. Although Winder initially considered transferring Roberts from the Range Master position, he did not do so; his staff looked into the possibility of a transfer, but ultimately believed that Roberts' position was a merit rank position not subject to transfer.

In 2009, merit rank lieutenants were reclassified one pay grade and received a raise. Because Roberts was not a lieutenant, he did not receive the pay raise. Yet, Roberts filed a grievance with the Merit Commission because the Range Master position was rated on the pay scale at a lieutenant-level position. Thus, Roberts believed that he was also entitled to the pay raise. In July 2009, the Merit Commission held a hearing to address Roberts' grievance. As a result of the hearing, the Merit Commission reclassified the Range Master position's pay grade, and Roberts received the raise he requested.

In 2010, Winder ran for and won reelection, and during his reelection, Roberts told Winder that he was supporting him. During that general time period, Winder oversaw the formation of the Unified Police Department of Greater Salt Lake ("UPD") and became its CEO. As Salt Lake County Sheriff and CEO of UPD, Winder supervised approximately 2,000 employees. Thereafter, Winder sought and won reelection in the 2014 election, and, again, Roberts supported him.

Eventually, in 2017, Winder made the decision to transfer Roberts from his position as Range Master to Patrol Sergeant. Roberts, however, objected to the transfer. In order to formally object, Roberts, through his counsel, wrote a letter to Winder wherein he claimed that the Range Master position was a merit rank position and not subject to transfer. Winder responded to the letter by explaining that he was construing it as a grievance. Winder denied the grievance, noting that the Range Master position was a specialist position and separate from Roberts' merit rank as Sergeant. Roberts' transfer became effective in April 2017. After Roberts' transfer, Winder assigned Todd Griffiths ("Griffiths") to manage the range. Several months later, Rosie Rivera ("Rivera") replaced Winder as Salt Lake County Sheriff and CEO of UPD.

After Roberts' transfer became effective, he quickly filed suit, alleging that his transfer was unlawful. Specifically, Roberts asserted six causes of action: (1) a request for a declaratory judgment that the Range Master position was a merit rank position; (2) violation of his procedural due process rights under the United States Constitution; (3) violation of his substantive due process rights under the United States Constitution; (4) violation of his due process rights under the Utah Constitution; (5) retaliation under 42 U.S.C. § 1983 in violation of Roberts' First Amendment free speech rights; and (6) age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"). In April 2018, Defendants moved for partial summary judgment on claims 1 through 5. On August 21, 2018, the court granted Defendants' motion as to Roberts' first four claims, but denied the motion as to Roberts' retaliation claim. In granting summary judgment on Roberts' first four claims, the court determined that the Range Master position was a "specialist" position—not a merit rank position—in which Roberts lacked

a constitutionally protected property interest. Accordingly, the court concluded that Roberts' transfer did not violate due process.

## DISCUSSION

Defendants now move for summary judgment on Roberts' two remaining claims for retaliation and age discrimination. "Summary judgment is appropriate if the movant 'shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Roberts v. Jackson Hole Mountain Resort Corp.*, 884 F.3d 967, 972 (10th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores*, Inc., 144 F.3d 664, 670 (10th Cir. 1998) (citation omitted). In applying this standard, the court must "view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016) (quoting *Ribeau v. Katt*, 681 F.3d 1190, 1194 (10th Cir. 2012)). Accordingly, if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," the movant's motion must be denied. *Roberts*, 884 F.3d at 972 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

### I.   Retaliation Claim

The Tenth Circuit has explained that the "First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Couch v. Bd. of Trustees of Mem'l Hosp. of Carbon Cty.*, 587 F.3d 1223, 1235 (10th Cir. 2009) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006)). As such, "a public employer cannot retaliate against an employee for exercising his [or her] constitutionally protected right of free

speech." *Id.* (quoting *Dill v. City of Edmond, Okla.*, 155 F.3d 1193, 1201 (10th Cir. 1998)). In analyzing First Amendment retaliation claims when an employer allegedly retaliates against an employee, the Tenth Circuit applies the five-prong *Garcetti/Pickering* test. *Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014); *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1301 (10th Cir. 2009); *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1203 (10th Cir. 2007).[1] The *Garcetti/Pickering* test is comprised of five elements:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Trant*, 754 F.3d at 1165. Implicit in this test is the "requirement that the public employer have taken some adverse employment action against the employee." *Couch*, 587 F.3d at 1236 (quoting *Belcher v. City of McAlester, Okla.*, 324 F.3d 1203, 1207 n. 4 (10th Cir. 2003)).

With regard to the second element, "[m]atters of public concern are 'those of interest to the community, whether for social, political, or other reasons.'" *Brammer-Hoelter*, 492 F.3d at

---

[1] In his opposition and during oral argument, Roberts argued that the *Garcetti/Pickering* test is the improper standard to apply to his retaliation claim. Instead, he cites an Eighth Circuit case and contends that the proper standard for analyzing First Amendment retaliation claims is the *McDonnell Douglas* framework—the same standard applied in Title VII employment cases. *See Tyler v. Univ. of Arkansas Bd. of Trustees*, 628 F.3d 980, 985–86 (8th Cir. 2011) ("First Amendment retaliation claims are analyzed under the same framework as claims of retaliation under Title VII."). The Tenth Circuit, however, has expressly rejected that position. *See Walton v. Powell*, 821 F.3d 1204, 1210–12 (10th Cir. 2016) (holding that the Tenth Circuit does not apply the *McDonnell Douglas* framework to First Amendment retaliation claims). Significantly, in *Walton*, the court noted "that almost every circuit to have considered whether *McDonnell Douglas* should apply in First Amendment discrimination or retaliation cases has thought the idea a poor one." *Id.* at 1210 (citing *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294–95 (6th Cir. 2012); *Allen v. Iranon*, 283 F.3d 1070, 1074–75 & n. 4 (9th Cir. 2002); and *Acevedo–Diaz v. Aponte*, 1 F.3d 62, 66–67 (1st Cir. 1993)). Moreover, the court pointed out that although the Eighth Circuit is the only circuit with authority applying the *McDonnell Douglas* framework to First Amendment retaliation claims, that precedent now seems uncertain. *Id.*; *see also Henry v. Johnson*, 950 F.3d 1005, 1011 (8th Cir. 2020) (analyzing First Amendment retaliation claim based on the principles espoused in *Garcetti* and *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois*, 391 U.S. 563 (1968)). Therefore, the proper standard to apply in First Amendment retaliation claims is the *Garcetti/Pickering* test.

1205 (quoting *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1224 (10th Cir. 2000)).  Indeed, matters of public concern involve "something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Deutsch v. Jordan*, 618 F.3d 1093, 1100 (10th Cir. 2010) (quoting *City of San Diego v. Roe*, 543 U.S. 77, 83–84 (2004)).  On the other hand, speech that merely "airs grievances of a purely personal nature typically does not involve matters of public concern." *Brammer-Hoelter*, 492 F.3d at 1205 (internal quotation marks omitted).  In deciding whether a matter is of public concern, courts are required to consider "the content, form, and context of a given statement, as revealed by the whole record." *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 147–48 (1983)).

As to the fourth element, a plaintiff bears the burden of establishing both an adverse employment action and "causation—that is, that the constitutionally protected speech was a substantial motivating factor in the employer's decision to adversely alter the employee's conditions of employment." *Couch*, 587 F.3d at 1236.  The Tenth Circuit has defined an adverse employment action in the First Amendment retaliation context as something that would "deter a reasonable person from exercising his or her First Amendment rights." *Lincoln v. Maketa*, 880 F.3d 533, 540 (10th Cir. 2018).  In regards to causation, relevant evidence may include evidence that "the employer expressed opposition to the employee's speech, or . . . the speech implicated the employer in serious misconduct or wrongdoing." *Maestas v. Segura*, 416 F.3d 1182, 1189 (10th Cir. 2005) (citation omitted).  Conversely, "evidence such as a long delay between the employee's speech and challenged conduct or evidence of intervening events tend to undermine any inference of retaliatory motive and weaken the causal link." *Id.* (citations omitted).

Importantly, when applying the *Garcetti/Pickering* test, the first three elements are "issues of law to be resolved by the district court, while the last two are ordinarily for the trier of

fact." *Cypert v. Indep. Sch. Dist. No. I-050 of Osage Cty.*, 661 F.3d 477, 483 (10th Cir. 2011) (citing *Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 745 (10th Cir. 2010)). However, summary judgement is nevertheless "appropriate when 'there simply is no evidence in the record from which a trier of fact could reasonably conclude the [protected speech] was a motivating factor'" in the adverse employment action. *Id.* at 484 (citing *Rohrbough*, 596 F.3d at 750) (alteration in original).

### A. Claims Against Winder

Roberts points to two instances of protected speech in support of his retaliation claim: (1) when he told Winder that he was supporting Kennard in the 2006 election; and (2) when he sought a pay raise in 2009. For the reasons set forth below, the court concludes that neither instance supports a First Amendment retaliation claim.

During the 2006 election, Roberts explained to Winder that he had already promised Kennard that he would support him. Roberts contends that, thereafter, Winder told several individuals that he desired to remove Roberts from his position as Range Master as a direct result of him not supporting Winder during the 2006 election. To corroborate this contention, Winder submitted testimonial evidence from three witnesses: Beau Babka ("Babka") and George Q. Nielsen ("Nielsen"), who testified that shortly after the 2006 election, Winder expressed a desire to remove Roberts because he had not supported him during the election; and David Scott Kilgrow ("Kilgrow"), who testified that Winder wanted to "get rid of Roberts." Based on this evidence, Roberts contends that his retaliation claim should survive Defendants' motion. The court, however, is unpersuaded by Roberts' argument when considering the fourth element of the *Garcetti/Pickering* test. As mentioned above, long delays in between the speech and the adverse action and evidence of intervening events tends to weaken the causal link necessary to establish a

First Amendment retaliation claim. *Maestas*, 416 F.3d at 1189. In this case, the gap between Roberts' statement and his transfer is more than ten years. A gap of such an extensive duration, the court concludes, not only tends to weaken the causal link, but effectively renders it nonexistent.[2] This remains true despite the testimonial evidence upon which Roberts relies. Importantly, Babka and Nielsen testified that Winder made such statements shortly after the 2006 election. As such, their testimony fails to account for or overcome the decade-long gap between the speech and the transfer. And, as for Kilgrow's testimony, he testified that he never heard Winder declare that he wanted to remove Roberts from his position *as a result of* Roberts' decision to support Kennard during the 2006 election. Thus, such testimony fails to establish or create a genuine issue of material fact regarding causation.

Furthermore, the lack of a causal link becomes even more stark when considering two significant intervening events between the speech and the transfer: the 2010 and 2014 elections. In both elections, Roberts specifically told Winder that he supported him, and, as such, those intervening expressions of support substantially undermine Roberts' previous statement of support for Kennard. Therefore, based on (1) the vast gap between Roberts' protected speech and his transfer from the Range Master position; and (2) Roberts' support for Winder in the 2010 and 2014 elections, the court concludes that Roberts' has failed to produce sufficient evidence that his 2006 statement of support for Kennard was a substantial motivating factor in his transfer from the Range Master position. Consequently, it cannot serve as a basis for his First Amendment retaliation claim.

---

[2] This is further supported by caselaw from this Circuit where courts have held far smaller gaps to be too long to establish the fourth element of the *Garcetti/Pickering* test. *See, e.g.*, *Hedquist v. Beamer*, 763 F. App'x 705, 716 (10th Cir. 2019) (holding that the plaintiff failed to establish a causal connection when there was a gap of just over two years); *Deschenie v. Bd. of Educ. of Cent. Consol. Sch. Dist. No. 22*, 473 F.3d 1271, 1278 (10th Cir. 2007) (holding that a fifteen-month gap between speech and adverse action was too remote to permit an inference of retaliatory motive).

Similarly, the court concludes that Roberts' 2009 request for a pay raise does not support his First Amendment retaliation claim. The court reaches this conclusion for several reasons. First, Roberts' request for a pay raise did not involve a matter of public concern. It did not involve a matter of legitimate interest to the public. Rather, it was a grievance purely personal in nature. Indeed, his request for a pay raise affected no one but himself. Second, there is no evidence that Winder opposed Roberts' pay raise. To the contrary, there is evidence in the record that Winder actually supported Roberts' request to increase his salary. Third, the record is devoid of any evidence establishing that Roberts' request for a pay raise was a motivating factor—in any respect—in his transfer to Patrol Sergeant.

The court therefore concludes that Roberts has failed to establish a First Amendment retaliation claim against Winder based on either the 2006 statement of support for Kennard or the 2009 pay raise request. Moreover, the court finds that no reasonable jury could conclude that Winder transferred Roberts because of the 2006 statement or the 2009 pay raise request. Accordingly, the court grants Defendants' motion as to Roberts' retaliation claim against Winder in his individual capacity.

### B. Claims Against Rivera and UPD

Roberts also asserts his First Amendment retaliation claim against Rivera in her official capacity as the CEO of UPD and UPD itself.[3] As a preliminary matter, it is noteworthy that Roberts has failed to establish an underlying claim for retaliation against Winder. Therefore, there is little basis—if any—to support a claim for First Amendment retaliation against Rivera

---

[3] Defendants also argue that Rivera is entitled to summary judgment for Roberts' claims against her in her personal capacity. However, there are no claims against Rivera in her personal capacity. In August 2017, Roberts moved to substitute Rivera for Winder given that Rivera was the new Salt Lake County Sheriff and CEO of UPD. ECF No. 11. In Roberts' motion, it is clear that he intended to continue his suit against Winder in his personal capacity and Rivera in her official capacity. *Id.* Thus, when granting the motion, the court explained that Rivera, in her official capacity, would be substituted for Winder, and Winder would remain as a defendant to the extent Roberts' was seeking relief against him in his personal capacity. ECF No. 12.

and UPD.  Furthermore, Roberts failed to address Defendants' arguments regarding municipal liability in his opposition.  As such, the court is unsure as to what basis Roberts is advancing his claims against Rivera and UPD.  Nevertheless, construing Roberts' pleadings and opposition liberally, the court will address Roberts' claims against Rivera in her official capacity and UPD.

The court also notes that Roberts' claim against Rivera in her official capacity "represent[s] only another way of pleading an action against" UPD.  *Cox v. Glanz*, 800 F.3d 1231, 1254 (10th Cir. 2015) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n. 55 (1978)).  Thus, Roberts' claim against Rivera is really the functional equivalent of his claim against UPD.  *See id.*

It is well-established that a governmental entity "may not be sued under § 1983 for an injury inflicted solely by its employees or agents."  *Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019) (quoting *Monell*, 436 U.S. at 694).  Instead, a governmental entity "may only be held liable when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."  *Id.* (internal quotation marks omitted).  Therefore, to establish municipal liability, a plaintiff must first demonstrate the existence of a municipal policy or custom such as:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Id.*

As mentioned above, Roberts failed to address UPD's liability under § 1983 in his opposition. Thus, the court is unsure as to what type of municipal policy or custom that Roberts his basing his First Amendment retaliation claim upon. Nevertheless, it appears that he may be asserting that an informal custom of political retaliation exists and/or contending that Rivera and Winder had final policymaking authority for UPD. To start, the court can quickly dispose of the first argument inasmuch as Roberts has failed to present adequate evidence to establish a pattern or practice of First Amendment retaliation by UPD.[4] On the other hand, the second argument requires a more in-depth analysis. Whether a government employee is "a policy-making official is a question of state law." *Brammer-Hoelter*, 602 F.3d at 1189. And in deciding whether an official constitutes a final policymaker, courts are "interested only in delegations of *legal power*." *Id.* (emphasis in original). Courts analyze three factors to determine whether a governmental employee possess legal power as a final policymaker for a municipality:

> (1) whether the official is meaningfully constrained by policies not of that official's own making; (2) whether the official's decision[s] are final—i.e., are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority.

*Id.* (quoting *Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995)).

In this case, neither Rivera nor Winder in their official capacities of CEO of UPD were final policymakers. As pleaded in Roberts' Second Amended Complaint, UPD is governed by a Board of Directors (the "Board"), and the Board is the final policymaker for UPD. Thus, Rivera's and Winder's decisions were and are constrained by policies set forth the Board, and

---

[4] While Roberts alleges that Winder transferred a handful of employees along with Roberts as evidence of a pattern of retaliation, the court finds such allegations to be unavailing. First, the allegations are mere speculation as to why Winder transferred the other employees. Second, as described above, an informal custom, which is what Roberts alleges here, must be so permanent and widespread that it constitutes a legitimate policy for all intents and purposes. *See Waller*, 932 F.3d at 1283. Roberts, however, has only pointed to a few alleged instances of retaliation. Given the thousands of employees that Winder oversaw, such allegations are utterly inadequate to be able to establish a pattern or policy of retaliation by Winder and UPD.

any decisions by Rivera or Winder were and are reviewable by the Board. As such, Roberts has failed to establish a UPD policy or custom on the basis of an employee with final policymaking authority. Accordingly, the court finds no reason or evidence to impose municipal liability on Rivera or UPD. Consequently, the court grants Defendants' motion as to Roberts' claim against Rivera in her official capacity and UPD. As a result, the court grants judgment in favor of Defendants on the entirety of Roberts' First Amendment retaliation claim.[5]

## II.   Age Discrimination Claim

The ADEA makes it unlawful for any employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). "[T]he ordinary meaning of the ADEA's requirement that an employer took adverse action 'because of' age is that age was the 'reason' that the employer decided to act." *Simmons v. Sykes Enterprises, Inc.*, 647 F.3d 943, 947 (10th Cir. 2011) (alteration in original) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)). Put differently, age must be a "but-for" cause of the adverse action. *Id.* While age need not be the only but-for cause of the adverse action, for an employer to be liable for an ADEA discrimination claim, a plaintiff must demonstrate that "age was the factor that made a difference." *Jones v. Oklahoma City Pub. Sch.*, 617 F.3d 1273, 1277 (10th Cir. 2010) (quoting *Wilkerson v. Shinseki*, 606 F.3d 1256, 1266 (10th Cir. 2010)).

A plaintiff can bring an ADEA claim based on direct or circumstantial evidence of discriminatory intent. *See Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1195 (10th Cir. 2008). If a plaintiff's claim is based on circumstantial evidence, as is the case here, courts utilize

---

[5] Defendants also argue that summary judgment is warranted based on qualified immunity. Based on the foregoing analysis, however, the court need not address Defendants' arguments regarding qualified immunity.

the familiar *McDonnell Douglas* burden-shifting framework to assess the claim. *Id.* Under this framework, the plaintiff must first establish a prima facie case of age discrimination under the ADEA. *Simmons*, 647 F.3d at 947. If the plaintiff can establish a prima facie case, the burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for its action." *Id.* If the defendant is able to make such a showing, the burden then shifts back to the plaintiff "to prove . . . that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.*

In order to state a prima facie case for age discrimination under the ADEA, a plaintiff must show that he or she was (1) a member of the class protected under the ADEA; (2) qualified for the position that he or she previously occupied; (3) suffered an adverse employment action; and (4) was replaced by someone younger. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000); *Rivera v. City & Cty. of Denver*, 365 F.3d 912, 920 (10th Cir. 2004). Importantly, however, to satisfy the prima facie requirement, these elements must be accompanied by "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion." *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) (alterations in original) (italics omitted); *see Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1146 (10th Cir. 2008) ("While the elements of a prima facie case under the *McDonnell Douglas* framework are neither rigid nor mechanistic, their purpose is the establishment of an initial inference of unlawful discrimination warranting a presumption of liability in plaintiff's favor."). Therefore, "[i]n the absence of facts tending to establish this initial inference, [a] plaintiff is not entitled to the presumption of discrimination and a defendant is not required to defend against the charge." *Adamson*, 514 F.3d at 1146.

Here, Roberts has established the first three elements, but there remain issues of fact regarding the fourth element. First, because he was over the age of forty years old at the time of his transfer, he was a protected class member under the ADEA. 29 U.S.C. § 631(a). Second, it appears that Roberts was qualified for the Range Master position. Third, Roberts suffered an adverse employment action when he was transferred from Range Master to patrol. *Jones*, 617 F.3d at 1279. (noting that the fourth element is "satisfied by a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits"). As to the fourth element, Roberts argues that Griffiths replaced him as Range Master. Conversely, Defendants contend that Winder never gave Griffiths the position or title of Range Master. Rather, Winder simply assigned Griffiths to be the lieutenant in charge of the range. While this issue of fact may suggest that Roberts' claim should survive Defendants' motion, the court nevertheless concludes that summary judgment is warranted because Roberts has failed to produce evidence creating an inference that Winder or any of the Defendants acted with discriminatory intent when transferring him. Indeed, the record lacks any sufficient evidence establishing—or even implying—that Winder transferred Roberts because of his age. Furthermore, based on the record before the court, it is equally true that Roberts has produced no evidence that his age was a but-for cause of his transfer—let alone that "age was the factor that made a difference" in his transfer. *Id.* at 1277. The court therefore concludes that summary judgment in Defendants' favor is warranted because no reasonable jury could conclude that Winder transferred Roberts because of Roberts' age.

Yet, even if the court were to assume that Roberts had satisfied the prima facie threshold, Defendants would still be entitled to summary judgment because Winder produced several

14

legitimate, nondiscriminatory reasons for Roberts' transfer—reasons that Roberts has failed to demonstrate were pretextual. In considering a defendant employer's reasons for its actions, "[t]he relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs." *Rivera*, 365 F.3d at 924– 25. Thus, courts consider "the facts as they appeared to the person making the decision, and [they] do not second-guess the employer's decision even if it seems in hindsight that the action taken constituted poor business judgment." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1119 (10th Cir. 2007). This is because a court's role is to prevent intentional age discrimination by an employer, "not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." *Id.* (quoting *Young v. Dillon Companies, Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006)). And, notably, at the summary stage, a defendant's burden regarding the reasons for its actions is one of production, not persuasion. *Id.*

Here, Winder proffered the following reasons for Roberts' transfer: (1) he was concerned about the negative training atmosphere created by Roberts at the range; (2) he was concerned about favoritism such that UPD employees received preferential treatment to Sheriff's Office employees; (3) he was concerned that Roberts' training style was outdated; (4) he was concerned about morale; (5) he was concerned about Roberts' management and use of the range; (6) he was worried that Roberts had held the Range Master position for so long that he felt he owned the position and the range; and (7) he believed, as a general matter, transfers for officers were beneficial both to the transferee as well as the police organization as a whole. Thus, because Winder has met his burden of production and proffered several legitimate reasons for Roberts'

transfer, the burden returns to Roberts to produce evidence that such reasons were a pretext for discrimination.

A plaintiff can demonstrate pretext by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [defendant's] proffered . . . reasons . . . that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Rivera*, 365 F.3d at 925 (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)). Roberts has failed to do so here. Instead, he argues that he was clearly more qualified than Griffiths to manage range. In light of that assertion, he cites to out-of-circuit caselaw to suggest that an inference of discrimination is therefore warranted given that employers generally do not replace their employees with less-qualified candidates. The court, however, finds this argument to be unavailing given that it was soundly rejected by the Tenth Circuit in *Branson v. Price River Coal Co.*, 853 F.2d 768 (10th Cir. 1988). In *Branson*, one of the plaintiffs argued that she was just as, if not more, qualified than a co-worker who retained his job while she was fired. *Id.* at 772. In analyzing this argument, the Tenth Circuit explained that "[a]s courts are not free to second-guess an employer's business judgment, this assertion is insufficient to support a finding of pretext. It is the perception of the decision maker which is relevant, not plaintiff's perception of herself." *Id.* (citation omitted). Therefore, Roberts' perception of himself and his assertions that he was more qualified than Griffiths to manage the range are irrelevant and unpersuasive. Instead, the court must consider the perception of Winder as the decision maker, and Winder has articulated seven legitimate reasons for Roberts' transfer. Furthermore, Rivera has confirmed and corroborated several of Winder's reasons for transferring Roberts. Thus, given that the court's role excludes acting as a "super personnel department," *Riggs*, 497 F.3d at 1119, the

court concludes that Roberts has failed to produce evidence demonstrating that Winder's proffered reasons were pretextual. Consequently, summary judgment is warranted on that additional basis.

Accordingly, the court grants Defendants' motion on the entirety of Roberts' ADEA age discrimination claim.

## CONCLUSION

Based on the foregoing reasoning, Defendants' Motion for Summary Judgment is hereby GRANTED in its entirety.

Dated this 13th day of July, 2020.

                BY THE COURT:

                */s/ Dale A. Kimball*
                DALE A. KIMBALL
                United States District Judge